UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:10-CR-53-KKC-3 |
| | ) | |
| v. | ) | RECOMMENDED DISPOSITION |
| | ) | |
| JOHNNY DALE MARCUM, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On referral from District Judge Caldwell (*see* D.E. 327), the Court considers reported violations of supervised release conditions by Defendant Johnny Dale Marcum.  This is his third revocation.

## I. Background

District Judge Thapar entered a judgment against Defendant in February 2012 after he pleaded guilty to one count of conspiracy to manufacture methamphetamine (21 U.S.C. §§ 841(a)(1), 846).  D.E. 186.  He was sentenced to 150 months of imprisonment and three years of supervised release.  *Id*. at 2-3.  The case was later transferred to Judge Caldwell.  Defendant was released from custody on June 17, 2021.

In July 2021, the United States Probation Office ("USPO") requested a new condition that required Defendant to submit to weekly drug testing for two months.  D.E. 304.  According to that "12B" report,

> On June 25, 2021, the defendant began receiving buprenorphine through a medication-assisted treatment program at Family Practice of Kentucky in Manchester, Kentucky.  A recent review of drug testing results submitted through the program revealed positive test results for methamphetamine and alcohol.  The samples were collected on June 25, 2021, and July 1, 2021.  The defendant denies

the use of alcohol and indicates the methamphetamine positives were due to one unintentional use.

The defendant has submitted five urine samples for testing at the United States Probation Office since his release, all of which have been negative for methamphetamine and alcohol. A urine sample submitted on June 23, 2021, returned positive results for buprenorphine. The defendant indicates this was due to daily illegal use of buprenorphine while in Bureau of Prisons custody.

The USPO also reported that Defendant was "attending weekly substance abuse treatment and has secured full-time employment." *Id*. Judge Caldwell approved the modification. *Id*.

On August 30, 2021, the USPO issued a report charging violations of the conditions that require Defendant to (1) follow the instructions of the Probation Officer, (2) submit to weekly drug testing, and (3) participate in substance abuse treatment at the direction of the Probation Officer. According to that report,

On August 20, 2021, the defendant called this officer and indicated he tested positive for COVID-19. The defendant stated he was unable to get a paper copy of the results until the following Monday. This officer instructed the defendant to provide documentation of the positive COVID-19 test on Monday, August 23, 2021. The defendant failed to provide documentation. This officer has made several attempts via telephone to reach the defendant since August 23, 2021, all of which have been unsuccessful. On August 25, 2021, this officer unsuccessfully attempted to contact the defendant at his home. Contact has also been made with the defendant's girlfriend, Debbie Rutherford, with whom he resides. She indicates she has had no contact with the defendant since August 24, 2021, and is unaware of his whereabouts.

The defendant failed to attend scheduled substance abuse treatment with Bouncing Back Counseling in Manchester, Kentucky, on August 25, 2021, and August 27, 2021.

Defendant stipulated to all three violations. D.E. 315. He was given a below-Guidelines revocation sentence of six months of incarceration, followed by three years of supervised release. D.E. 318. Defendant was released again on March 7, 2022.

2

On December 15, 2022, the USPO issued a report that charged a violation of the condition that requires Defendant to notify the USPO of any change in residence.  *See* D.E. 332.  According to that report, an attempted home visit revealed the person who was letting Defendant stay in his basement had evicted him two weeks prior on the belief that Defendant had stolen $200. Defendant did not notify Probation of this change in residence.

After his arrest on the charge, Defendant stipulated to violating Standard Condition #5, but he did not admit to the details of the allegation.  Defendant did not agree that he had been evicted or that he had stolen any money.  According to Defendant, he reported the change of address on his monthly report and mailed it in early December, but the Probation Office apparently never received the report.  Defendant said he believed submitting the monthly report was all he needed to do regarding his change of address.  He said that he decided to move into his late mother's house when given the opportunity.  But he agreed his Probation Officer had not been notified within the required time frame.

By Judgment entered January 25, 2023, the Court imposed a below-Guidelines sentence of six months, followed by supervision to terminate on March 6, 2025.  The Court found leniency was warranted because Defendant had been making great strides and the violation was technical in nature.  *See* D.E. 332 at 9.

Defendant was released again on July 4, 2023.  On July 17, 2023, he was referred to Bouncing Back Counseling for outpatient substance abuse counseling.

On October 13, 2023, Judge Caldwell approved the USPO's request to add a condition that prohibited consumption of marijuana and cannabinoids, even if prescribed and even if legal in the jurisdiction.  D.E. 337.  A urine test yielded positive results for marijuana metabolite, but Defendant explained that he had "smoked a legally purchased hemp derivative vape pen."  *Id*.

3

That report noted that Defendant had "maintained the same residence, participates in substance abuse treatment, and has remained complaint with all conditions of release." *Id*.

## II. Violation Report

On August 28, 2024, the USPO issued the Supervised Release Violation Report ("the Report") that initiated these proceedings. The Report charges a single Grade C violation of the condition that prohibits committing a federal, state, or local crime. According to the Report,

> On August 18, 2024, Marcum was arrested by the Laurel County Sheriff's Office, and charged in Laurel County District Court, London, Kentucky, case #24-M-1022, with Assault, 4th Degree, Domestic Violence, Minor Injury (KRS 508.030, a Class A misdemeanor). . . . On August 19, 2024, Marcum appeared in Laurel County District Court for arraignment, and he entered a plea of guilty to Assault, 4th Degree. He was sentenced to 360 days jail, 346 days jail conditionally discharged for two (2) years (credit for 14 days time served).

The citation contains the following narrative:

> I responded to a domestic violence complaint on TIB Drive. Upon arrival, I made contact with the female victim. She advised that her boyfriend, Johnny Marcum, had punched her in the eye and had assaulted her. I observed redness and she was bleeding around her right eye. She advised he took her cell phone and told her she wasn't calling the police and she ran next door to the neighbors to be able to call and he ran out of the back door of the home. Myself and Deputy Lewis began searching the field behind the residence. Deputy Lewis located the accused hiding in some bushes in the fence line.

The Court conducted an initial appearance pursuant to Rule 32.1 on September 4, 2024, and set a final hearing following a knowing, voluntary, and intelligent waiver of the right to a preliminary hearing. D.E. 340. At the initial appearance, the United States made an oral motion for interim detention. Defendant did not seek release. Based on the heavy defense burden under 18 U.S.C. § 3143(a), the undersigned remanded Defendant to the custody of the United States Marshal. *Id*.

After providing the parties time to arrange for witnesses, on September 30, 2024, the Court conducted a final hearing on the violation allegation.  D.E. 346.  Defendant was afforded all rights due under Rule 32.1 and 18 U.S.C. § 3583.  The government called two witnesses: Defendant's probation officer Joey Tyler and the arresting officer, Laurel County Sheriff's Deputy Cyruss McVey.  The defense called Margaret Whicker, who is Defendant's girlfriend and the alleged victim of the assault.  Defendant, warned of his right to remain silent, also testified.  *See* D.E. 347.

### III.  Testimony at the Contested Final Hearing

The following summary of testimony includes only the highlights most relevant to the question of Defendant's guilt.  The defense argued that that Defendant never struck or assaulted Ms. Whicker in any way.  The defense theory is that there was an argument and Whicker got either scared or angry and phoned law enforcement from the neighbor's house.  Whicker then (falsely) informed the Sheriff's deputy and PO Tyler that she had been assaulted because she knew doing so would get Defendant in trouble (or at least get him a safe distance away from her).  To provide a summary preview of the testimony, Deputy McVey and Officer Tyler testified Whicker told them Defendant had punched her in the eye.  Yet Whicker testified she never said such a thing— she had only accidentally been scratched in the eye by a piece of paper and had tripped over a rug.  Defendant was also adamant that he had not assaulted Whicker.

### A.

First, Defendant's probation officer, Joey Tyler, testified that Ms. Whicker telephoned him on August 19.  She informed him that Defendant had been arrested for, and pleaded guilty to, fourth-degree assault.  Tyler already knew Whicker, "Defendant's girlfriend and victim," from previous interactions at "home visits at her residence."  Tyler testified (as transcribed from the recording by the Court):

5

A:      She said that he had assaulted her with what she thought was a box, a small plastic box in his hand.  Hit her in the eye with it.  Shoved her to the ground.  And wouldn't let her get back up.

. . . .

Q:      She did say that he had hit her with something in the eye?

A:      Yes.

Q:      Did she say how badly injured she was?

A:      I don't recall what she said.  She said that it hurt her.  But I don't recall exactly how she described her injury.

Q:      Did she tell you that she's the one that called the police?

A:      Yes, she did.

Officer Tyler then testified that, following Whicker's call, he confirmed from court records that Defendant had pleaded guilty to fourth-degree assault in Laurel County as described.

On cross-examination, Officer Tyler agreed that sometimes people with an "axe to grind" will try to get supervisees in trouble.  He had previously found a false allegation like that.  But, on re-direct, Officer Tyler said he had no indication Whicker was vindictive or had an axe to grind against Defendant.  Defendant had just moved into her house three or four days earlier.  The couple seemed to have a healthy relationship, and nothing suggested to Tyler that Whicker was out to get Defendant.  When asked by the Court whether he had any reason to doubt the truthfulness of what Whicker had told him, Officer Tyler answered, "no."

**B.**

The second witness was Laurel County Sheriff's Deputy Cyruss V. McVey (misspelled as "McVay" at Docket Entry 347).  He testified that, on August 18, he responded to a complaint involving a domestic violence injury.  McVey read the narrative from his citation, which includes

6

that "[Whicker] advised that her boyfriend, Johnny Marcum, had punched her in the eye and had assaulted her.  I observed redness and she was bleeding around her right eye."  Deputy McVey testified he could also independently recall the injuries he observed at the scene.  He said he saw redness around Whicker's eye consistent with being punched in the eye.  At the end of direct examination he was asked again:

> Q:     If I understand your testimony correctly, not only was it red around the eye, she was actually bleeding around the eye, is that right?
>
> A:     Yes.
>
> Q:     And you observed the bleeding from her eye, or around the eye area?
>
> A:     Yes.

Deputy McVey testified on cross-examination that Ms. Whicker declined his offer to obtain medical assistance.  He did not see any assault, but he did think the living room looked as if a "struggle" had happened.  There were "knocked over lamps" and "disorganization of stuff," which appeared to corroborate that there had been an assault.  McVey testified that Defendant did not resist arrest or try to flee.  He was cooperative.  McVey told Defendant about the allegations of assault, but Defendant "wouldn't say much."  He neither admitted nor denied the allegation.

Deputy McVey provided further details when questioned by the Court.  It was dispatch who told McVey that Whicker had called from the neighbor's house.  McVey obtained the phone from Defendant and returned it to Whicker, with no objection from her.  As to whether Whicker seemed agitated, Deputy McVey testified, "I could tell she was upset [by] her body language, the way she was speaking to me, just redness on her face, hands were shaking, you could tell she was just upset."  Whicker and Defendant did not interact with each other after McVey arrived.  Finally,

McVey testified he was not aware of Whicker reaching out to anybody to correct the existing account of what happened.

## C.

Testifying for the defense, Magaret Denise Whicker (incorrectly spelled "Wicker" at Docket Entry 347) said that Defendant had been her boyfriend for about a year.  At the time of the incident, he was living in her house, and they shared the use of her phone and her truck.  They got into an argument on August 18 after he drove the truck to a worksite in Corbin and she then retrieved it without telling him, leaving him temporarily stranded.  She explained the origin of her eye injury:  Defendant

> come out there, and he had like a piece of paper or something in his hand.  And I was trying to shut the door.  And he was trying to open the door.  And he had like a piece of paper in his hand.  Well, it kind of hit my eye.  But he did it on accident, it was not done on purpose.

She testified that they argued when they got home.  Ms. Whicker said that she thought at first that Defendant pushed her down, but she actually "fell over a rug."  She said a friend was standing in the doorway at the time, who saw it happen.  And the friend later told her that she had tripped.

Ms. Whicker testified she called the police and told them Defendant had assaulted her.  But she later realized she was mistaken:  "I thought he pushed me, but it wasn't that he pushed me.  I fell on the rug.  It was behind me."  She testified that she explained to the responding officers that the cut on her eye was from the piece of paper that "sort of ran across my eye."  She took issue with the narrative in Deputy McVey's citation:  "No, he did not punch me in no eye.  And I did not explain that to them that he punched me in the eye."

Ms. Whicker said she was "scared" when she called the police because she had previously been abused by her husband, including being slashed on the hands with a knife.  The verbal

argument with Defendant frightened her to the point that she called the police, but Defendant did not assault her, by which she means hitting or abusing someone.

Concerning her call to Probation Officer Tyler, Ms. Whicker testified she told him "we got into an argument, yes, and I fell off of a rug, yeah." Ms. Whicker testified that she did not want to see Defendant go to jail or get in trouble. She was simply "afraid" during the argument because she "did not know what was going to happen." Ms. Whicker testified that, after she learned of the guilty plea and 14-day sentence, she tried to call Laurel County Sheriff John Root "numerous times" to correct the record. She said she also tried to contact Judge Skip Hammons. She wanted it known that the officer's account was false. She never told the officer she'd been punched in the eye. She said she told the deputy she was "scratched in the eye by a piece of paper." She testified Defendant has "never" struck her. On cross-examination, Ms. Whicker had no doubt she had told the deputy at the scene that she had fallen over a rug. Further, "My face was not bleeding. It was . . . was kind of swollen right there. It was not bleeding. . . . It was red right there, in the corner of my eye right there . . . like swollen, but no, it was not bleeding."

Ms. Whicker knew Defendant was on federal supervision and knew his probation officer. She was not aware Defendant's release had been previously revoked. She remembered calling Officer Tyler and telling him Defendant was in jail. She did not remember telling him Defendant had pleaded guilty. Nor did she recall saying Defendant had assaulted her. She thought she told Officer Tyler that they had gotten in an argument, and she thought she told him about falling over the rug, but she was not sure—"My memory's not really that great." She conceded that she could have told Officer Tyler that Defendant had assaulted her, but she does not remember doing so. She testified that, although she tried to contact the Sheriff and the state judge to correct the record, she did not try to call Officer Tyler to let him know the guilty plea was false.

9

When questioned by the Court, Ms. Whicker testified she had spoken to Defendant in jail several times after his guilty plea.  At first, she said they had not talked about the incident.  But then she testified that, in these conversations she told Defendant that "he didn't knock me down or do what them cops say he did."

Deputy McVey and Ms. Whicker were sequestered prior to their testimony.

## D.

Finally, Defendant testified.  He verified that he got into an argument with Whicker on August 18 because he was upset she took the truck and left him stranded at a worksite in Corbin. He did not remember a paper in his hand that scratched her eye, but he accepts her account of the injury.  Defendant insisted he had never hit a woman and did not come close to hurting Ms. Whicker.  He understood that she got scared during the argument and went to call the police.  He took the phone because he was trying to prevent her from calling law enforcement because he knew it could lead to another revocation.

Defendant testified he saw Ms. Whicker fall over the rug.  He did not remember her face being swollen or bloody.  All she had was a small red mark in the corner of her eye—no blood at all.  "I know how to hit a person, sir.  If I would have hit her, she would be hurt.  I've never hit a woman in my life, and I refuse to accept that."  Defendant testified he was not a violent man—he had never had a fight in prison.  But he did admit to the violent incident in 2003 described in paragraph 42 of the PSR.[1]

---

[1] "Marcum took $250 cash from the register drawer at Shell Food Mart, Renfro Valley, using a knife held to the throat of the store clerk forcing her to open her register.  The act was captured on video."  Defendant testified he was blacked out on drugs at the time of this incident and did not remember it.  He knew it happened because it was on video.  He said that was the only violent act he had ever done.

Concerning his arrest, on cross-examination, Defendant said he refused to talk to the deputies who arrested him.  "I do not talk to officers; I've learned [not to do] that, not to make statements to officers like that."  He did not recall Deputy McVey talking about why he was there or what he was being arrested for.  They did not tell him he was accused of hitting Ms. Whicker.

He said that the next morning, he panicked.  Without his glasses, he could not read the citation at all.  At his video arraignment, he pleaded guilty because he thought he could get out of jail immediately by doing so.  He was surprised by the sentence because he did not understand the charge.  "If I could have read that citation and seen what it said, there is no way in the world I would have pled guilty to that.  No way, man.  I could not see a word on it.  All I had on my mind was getting out of jail, that's it."

## IV.  Analysis on Guilt

The Court may revoke a term of supervised release if it finds by a preponderance of the evidence that the defendant violated a condition of his supervised release.  18 U.S.C. § 3583(e)(3). The question of whether the government met its burden here is close.  Defendant and his alleged victim testified passionately and consistently that the assault never happened.  But their testimony is difficult to fully credit for several reasons.

First, Defendant has a motivation to avoid being sent to prison again and Ms. Whicker is motivated to be reunited to her boyfriend and financial provider.  The other witnesses have no discernable motivation to bend the truth to reach a certain result.  Ms. Whicker also had trouble recalling specific details and admitted to memory problems.  By her own testimony, she was even confused at the time of the incident—she thought Defendant had pushed her down but later came to believe she had tripped over a rug on her own.

11

The second problem is Defendant's guilty plea to fourth-degree assault.  Defendant insists he could not read the citation and did not know the charge against him.  But Defendant, a career offender under the Guidelines, has ample experience with the justice system.  He admitted he is savvy about charges, arrests, and convictions, including his strategy to avoid talking to cops.  In the underlying federal case, Defendant pleaded guilty *and then moved to withdraw the plea*.  It is difficult to accept that this Defendant, while on federal supervision, would blindly admit guilt to a criminal charge.  Defendant should understand by now that *any* state conviction (whether violent or not) would almost certainly trigger revocation proceedings.  Given his experience in the legal system and his personality, Defendant is exactly the sort of person one would expect to fight a charge if he believed he had any chance of success.  Defense counsel argued that innocent people plead guilty in state district court "all the time, just to get it over with."  But it would be a huge strategical error for a federal supervisee like Defendant to do such a thing.  This is his fifth reported violation and third revocation proceeding.  He doubtlessly knows that any violation, including any state conviction, could result in up to two years in federal prison.  It is much more plausible to believe Defendant pleaded guilty so quickly because he was guilty and he knew the evidence against him was strong.

The third problem is that Defendant's guilty plea (not his hearing testimony) is consistent with the citation, the testimony of Deputy McVey, and the testimony of Officer Tyler.  According to the citation, Ms. Whicker said that "her boyfriend, Johnny Marcum, had punched her in the eye and had assaulted her."  And McVey "observed redness and she was bleeding around her right eye."  McVey said he retained an independent recollection of this encounter.  Officer Tyler recalled that Whicker told him Defendant "had assaulted her with what she thought was a box, a small plastic box in his hand.  Hit her in the eye with it.  Shoved her to the ground.  And wouldn't let her

get back up." Here, two credible witnesses recall Whicker telling them on the night of the incident and the following day that Defendant had hit her in the eye.  Although she now says she merely tripped over a rug and got scratched by a piece of paper, Whicker told Officer Tyler on the day of Defendant's guilty plea that he had punched her and shoved her to the ground.  The Court hereby makes the factual finding that Whicker told Deputy McVey and Officer Tyler that Defendant had hit her in the eye.  The Court also doubts that a paper cut inflicted in Corbin would still be bleeding, as described by McVey, after the time it took to travel to London.

Given this factual finding, the evidence preponderates in favor of the government's theory because that theory makes more sense in light of the whole evidence.  It is plausible to believe that Defendant assaulted Whicker, she reported it, and he pleaded guilty because it happened the way Whicker said it did on August 18 and 19.  It is plausible to believe that, with federal revocation looming, Defendant and Whicker would change their story to prevent him going to jail again.  It is less plausible to believe that Whicker made these reports and Defendant pleaded guilty with both of them knowing the underlying claim was untrue.

Defense counsel's theory is that Whicker concocted a false story to get Defendant in trouble and teach him a lesson due to the altercation.  But not a single witness provided evidence that Whicker had an axe to grind against Defendant.  The two provided affectionate testimony about each other.  Nothing before the Court suggests she had it in her to press false charges.  Rather, the record makes more sense if one believes she made the initial accusations because they were true, but then backpedaled once she realized the severe consequences for Defendant and her life with him.

Ms. Whicker's testimony was not that she had an axe to grind, but that she was afraid and confused.  She said she was never hit in the eye, but merely fell over a rug and mistakenly thought

she had been shoved.  But then, why would she tell both McVey and Tyler that she had been struck in the eye, as the Court has already found?  Whicker's story about the piece of paper and the rug does not hold up well to scrutiny, either.

The entirety of the evidence makes the most sense under the theory that Defendant assaulted Whicker (consistent with Whicker's reports and Defendant's guilty plea) but they later decided to spin an alternative story to prevent this revocation.  The Court thus finds the evidence preponderates in favor of a finding of guilt.  Violation #1 occurred.  For purposes of Rule 32.1 proceedings, the government has stablished the violation under the standard of § 3583(e).

## V.  Potential Penalties

The Court has evaluated the entire record, the Report and accompanying documents, and the sentencing materials from the underlying Judgment (including the sentencing transcript) and the prior revocation.  Additionally, the Court has considered all the 18 U.S.C. § 3553 factors imported into the § 3583(e) analysis.

Under § 3583(e)(3), a defendant's maximum penalty for a supervised release violation hinges on the gravity of the underlying offense of conviction.  Defendant's underlying conviction is a Class C felony.  This results in a two-year maximum period of incarceration upon revocation pursuant to § 3583(e)(3).

The Policy Statements in Chapter 7 of the Sentencing Guidelines provide advisory imprisonment ranges for revocation premised on criminal history (at the time of original sentencing) and the "grade" of the violation proven.  *See United States v. Perez-Arellano*, 212 F. App'x 436, 438-39 (6th Cir. 2007).  Under Section 7B1.1, Defendant's conduct (a Class A Misdemeanor) qualifies as Grade C.  Given Defendant's criminal history category of VI (the

14

category at the time of the conviction) and a Grade C violation, Defendant's range, under the Revocation Table of Chapter Seven, is eight to fourteen months.  U.S.S.G. § 7B1.4(a).

A court may re-impose supervised release, following revocation, for a maximum period that usually subtracts any term of incarceration imposed due to the violation.  *See* 18 U.S.C. § 3583(b) & (h).  Defendant's conviction for a conspiracy to manufacture methamphetamine does not carry a maximum term of supervised release.   18 U.S.C. § 3583(h); 21 U.S.C. § 841(b)(1)(A)(viii).

## VI.  Sentencing Arguments

After the Court announced its finding that the violation occurred, the government recommended a top-of-the-Guidelines fourteen-month revocation sentence, followed by two years of supervision.  The defense requested a bottom-of-the-Guidelines sentence of eight months, also to be followed by two years of supervision.

The government focused on Defendant's history.  This includes his career offender status, and some crimes the government believes indicate a potential for violence.  This includes not only the robbery of the gas station clerk, but also burglaries and residential invasions.  There are also two incidents of violation conduct where the USPO sought modification, not revocation. Along with his two prior below-Guidelines revocation penalties, these mean Defendant has been shown extra grace.  That this is his third revocation also warrants a serious penalty.  As for additional supervision, the government suggested that Defendant can do well if he can demonstrate two years of straight compliance.

The defense stressed that the contested violation is an evidentiary close call, which counsels against being too severe.  Defendant also should be given credit for not being on meth.

15

His criminal history has been driven by his drug use.  He is doing well that this no longer being the case.

Defendant briefly addressed the Court.  He said, "You should let me go home. . . .  I can't say nothing."  He also said his high blood pressure was making him agitated, and the jail needs to do more to address it.

## VII.  Sentencing Recommendation

To determine an appropriate revocation term of imprisonment, the Court has considered all the statutory factors imported into the § 3583(e) analysis, as well as the Guidelines Range.

In crafting a penalty, the Court must consider the nature and circumstances of Defendant's underlying conviction.  *See United States v. Johnson*, 640 F.3d 195, 203 (6th Cir. 2011) (explaining that this sentencing factor focuses upon the original offense rather than the violations of supervised release).  Defendant was a "smurf" who obtained pseudoephedrine and other supplies for use in manufacturing methamphetamine.  Currently, there is no indication of methamphetamine use since 2021.

The Court next considers Defendant's history and characteristics.  Defendant's criminal history is terrible.  His nine previous parole revocations and two federal revocations in particular stand out.  This is his fifth reported violation conduct, and it is the most serious thus far.

The Court must also consider the need for additional training or treatment.  Defendant has been receiving drug-abuse treatment while on release.  And it appears to have been effective, notwithstanding the THC incident last year.  At the final hearing, the Court suggested adding a condition for mental-health treatment, specifically anger management treatment.  This was based on the testimony of Ms. Whicker and Defendant concerning how he became so angry at his work supervisor and Ms. Whicker.  And, of course, the Court finds he committed fourth-degree assault.

16

The parties had no objection to adding a condition that provides for available anger-management treatment.

The Court must also consider the need to protect the public and deter future criminal conduct. Defendant's lengthy criminal history suggests he presents a continuing risk to the public that needs to be deterred. Defendant has made great strides, particularly in avoiding drug abuse. But here, the Court has found that a violent act occurred, which creates a need for deterrence and protection.

The Guidelines suggest the ***primary*** wrong in the supervised release context is the violation of the Court's trust by an offender; the particular conduct is an important but secondary issue. *See* Guidelines 7 Pt. A(3)(b). The Court must impose a sentence that is sufficient, but not greater than necessary, to address Defendant's breach of trust and the other statutory goals imported into section 3583(e). Defendant was shown leniency in July 2021 when he tested positive for meth because Probation did not seek revocation, but rather increased drug testing. But Defendant then evaded both Probation and his treatment and his revocation was revoked in the Fall of 2021. Although the Court did not grant his request for treatment in lieu of revocation, he was given a below-Guidelines sentence of six months. That below-Guidelines sentence was "based on the expectation that Defendant will likely be referred to inpatient treatment upon release." D.E. 315 at 9. Defendant was actually referred to outpatient substance abuse counseling, but the counseling appears to have been effective. There was a positive urine screen for marijuana metabolite, but the USPO accepted Defendant's vape-pen explanation and he was not revoked. D.E. 337. Defendant's second revocation, like his first, resulted in a below-Guidelines six-month revocation sentence. The fact that this is the third revocation (and fifth report of violation conduct) weighs in favor of revocation and a significant penalty.

17

One factor the Court must consider is the need to avoid unwarranted sentencing disparities. This factor is usually addressed, as here, by imposing a within-Guidelines sentence.

A full twelve months, which is near the middle of the Range, is appropriate here. While not overly punitive, this sentence addresses the seriousness of the breach of trust and the need to protect the public and deter further criminal conduct. Defendant still needs to be monitored, which justifies two further years of supervision.

## VIII.

Based upon the foregoing, the Court **RECOMMENDS**:

(1)     That Defendant be found guilty the charged violation.

(2)     Revocation with a term of imprisonment of twelve months, followed by 24 months of supervised release.

(3)     The addition of a condition providing for mental-health treatment (in particular anger management) at the discretion and direction of the probation officer.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. *See also* 18 U.S.C. § 3401(i). Pursuant to Rule 59(b)(2), any party wishing to object **SHALL** do so by an appropriate filing in the record within **FIVE DAYS** after being served with a copy of this recommended decision. Any party may object to any or all portions of this recommendation for consideration, *de novo*, by the District Court. Failure to make timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Wandahsega*, 924 F.3d 868, 878 (6th Cir. 2019).

18

Defendant's right of allocution under Rule 32.1 is preserved, as reflected in the record. Any waiver should comport with the Court's standard waiver form, available from the Clerk. Absent waiver, the matter will be placed on Judge Caldwell's docket upon submission.  If Defendant chooses to waive allocution, he **SHALL** do so on or before the deadline for filing objections.

This the 9th day of October, 2024.

Signed By:

_Hanly A. Ingram_

**United States Magistrate Judge**

19